24-1367, Packard v. City and County of Denver And I do note that we have some Council splitting time here. We try to honor that, but be forewarned that if we get in the heat of the moment and use up all the time before the second one of you gets up, we'll just go ahead and apologize now. All right. Thank you, Your Honor. Fred Yarger for Appellant City and County of Denver. And may it please the Court. A municipality can be held liable under Section 1983 only if a plaintiff satisfies rigorous standards of causation and culpability. Here, the District Court failed to enforce those rigorous standards, making rulings in this case that contradict both the plaintiff and the plaintiff. In fact, the District Court rejected the rulings of other judges from the same district in cases arising from the very same protests in Denver in May and June of 2020. Through those rulings, the District Court allowed plaintiffs to submit a wide range of confusing theories to the jury, some of which other judges in the same district have rejected. And instructing the jury on those claims, the District Court lessened the culpability required to hold a municipality liable, blurring the line between municipal and vicarious. Liability and violating this court's precedent. We've raised five issues in the briefing, which is likely too many to address today. I'm happy to answer questions about any of them, but I'd like to focus on two of them this morning, which we believe are the clearest errors by the District Court, either one of which separately requires reversal and retrial. First is the erroneous admission of the testimony of Nicholas Mitchell, the former Denver independent monitor. Second is the instruction to the jury that deliberate indifference would be an element only on plaintiffs' failure to train theories of municipal liability and on no other theories. Turning to the first issue, which is the District Court's erroneous admission of Mr. Mitchell's testimony. Before admitting this testimony, the District Court took a very unusual step. It explicitly warned plaintiffs not to call Mitchell to the stand. It told them that they were, quote, risking their entire case. And the court said, if it causes your verdict to be reversed, that's on you. I think you're making a mistake. That's my ruling. More unusual and more problematic, the District Court cited no valid basis. Let me ask you about that. I mean, he wasn't ruling as to the admissibility of the testimony. He was recognizing that they might call him and expressing concern that even though, if they did, he would be able to testify, it could be on shaky ground. Is that fair? Well, it was during the final statements of the court, after hearing arguments from the parties, and the problem was that the court gave no valid basis for admission of Mitchell's testimony. Really, the only basis in the record is that Mitchell's work as independent auditor was, quote, paid for by the taxpayers, and taxpayers sitting in the jury box are entitled to hear about it. So the court didn't do an analysis under Rules 602 or 701, did not do an analysis under Rule 407, and didn't do an analysis under Rule 403. That's a textbook example. I mean, the city chose to have an observer, didn't they? A monitor? A monitor, yeah. It did. And they allowed the monitor to go do his job? Of course they did, yes. He was specifically asked by the city council to do this work. So they must have felt that there was something relevant to what he was doing. To the extent it was relevant, Your Honor, that's the problem. It was a subsequent remedial measure. It was also the work of someone who was not personally present. He couldn't testify to any facts that actually occurred based on his own perception or knowledge. He admitted that on the stand. He said he was not personally present to observe anything, whether with respect to individual protesters or the action of any DPD officers. Can I ask you a question about that? Yes. Was there a hearsay objection raised and preserved? There was. We did object to the admission of certain memoranda that formed the basis for Mr. Mitchell's testimony. But those memoranda did not come into evidence, is that right? They did come in and he testified to the substance of them. Were they submitted as exhibits and admitted as evidence? I believe they were, Your Honor. I'm not sure about that. But in any event, other than objecting to memoranda, did you ever give a hearsay objection to Mitchell's report? The report itself, Your Honor, was excluded, not on the grounds of hearsay. The testimony about the report. I know it was excluded because they worried about remedial comments. But did you make a hearsay objection to his discussion of the content of the report? No, there was not a hearsay objection. There was an objection based, Your Honor, on Rules 602 and 701. And the only way that Mr. Mitchell could testify to the substance of a post hoc report based on his review of four months worth of evidence would have been had he been qualified as an expert witness. And everybody agreed that he was not. Everyone agreed he was not. He was not even trying to authorize his testimony on that grounds. They are trying to authorize it on the grounds that even non-experts can give opinions of things they have observed. And so then the question is, what does that mean? Does that mean things you've observed from your study of the records? Or does it mean you were out there when the bullets were flying and you observed all that stuff? And that's the question in this case. Correct, Your Honor. That's correct. And he was not there to observe any of it. He admitted that on the stand. And the problem with his testimony, sometimes lay opinion testimony can come into evidence if there's an opinion about evidentiary material already before the jury. For example, a photograph. Someone can say, I visited the site of that photograph. I believe the distance between two points on that photograph is about 50 yards. And they don't need to be qualified as an expert. They do not. Because that's common knowledge. I mean, that's within common experience.  And I would suppose that even though riots are not common, hopefully not yet in our country, common experience, it does involve real on-the-road experiences that people probably have encountered. It absolutely does. And that's why they qualified, plaintiffs qualified two experts to testify to much of the same material. And not only that, Mr. Mitchell was testifying based on his training as a lawyer, his understanding of department policies, and in fact, his understanding of the Constitution and whether any of the actions he was testifying to violated those policies as informed by the Constitution. That's volume 23 of the appendix, page 70, where he specifically says, I'm testifying based on the Constitution. That is classic expert testimony. And Judge Brooks said that he was testifying as an observer of materials that he has reviewed. I must say, when I read that, and I expect it's true with my colleagues, that struck me as a bit odd because usually you think of it as firsthand observation. But what is the law on that about people qualifying as a non-expert to testify as an observer of things they read which reported other things? So the case law in the briefing cited on this, Your Honor, typically comes up in the context of surveillance activities by agents or detectives. And so typically the line is, if you were there and you conducted the surveillance, or if the basis of your testimony and your opinion can be gleaned simply based on what you are reviewing in front of the jury, for example, identifying the voice of a defendant after hearing that defendant testify and after conducting hours of surveillance, there's no problem with that testimony. The trouble is when it crosses the line into opinions based on an officer's general experience as a law enforcement investigator, for example, in drug investigations, testifying to the meaning of certain words and phrases used by people on recordings. That's the Peoples case and the Johnson case cited in the briefing. Both of those cases were reversed because agents were allowed to testify about the meaning of words or phrases used on recordings that were not clear to the jury, would not be clear to a lay observer. So it really is the distinction between mundane testimony that anybody could give as an observer or somebody who's using their experience. And Mr. Mitchell, plaintiffs emphasized Mr. Mitchell's experience. They told the jury that Mitchell spent months with a team of experts looking at everything to give the jury the full picture. And that leads me to my second point, Your Honor, which is that this was prejudicial. The purpose of admitting the testimony and for the plaintiffs to argue so hard in favor of admitting his testimony was to influence the jury. He is the only witness they could use to tell the jury that he was the Denver official tasked with assessing the department's response to the protests and giving recommendations and assessing the police's response to that protest. So that was the very purpose of it. Counsel, a moment ago, though, you referenced the other two experts that were called by the plaintiffs. Yes. And I think I heard you say that they essentially testified about the same things. So why wasn't this harmless? If the plaintiffs call two experts, my understanding is the city called none. So this isn't a battle of the experts. There are two experts plus the independent monitor called by the plaintiffs. So why wouldn't this be harmless? Because the sole reason they called him was so that they could tell the jury that the Denver official tasked with assessing the response. This is what they said to the jury. I'll just read it for you. Mitchell concluded after his months-long investigation that Denver committed extremely troubling acts. Those were his words. The government official from the city of Denver tasked with investigating the police. They committed extremely troubling acts with very dangerous weapons. They could say that about no other expert. And the problem Are you saying if it were not Mitchell that gave that testimony, but if it was a third person who did exactly the same studies as Mitchell, but it was an outside person, that you wouldn't have had any troubles with it? Your trouble is that it was done by Mitchell, who I assume you didn't object to doing the report in the first place. Well, of course not. But, Your Honor, cities like Denver employ independent monitors. So that they have the benefit of someone looking at this information and making recommendations. And the word independent has some weight. Shouldn't it have some weight? What's that, Your Honor? Well, independent monitor. You're now saying he's tainted because he was associated with Denver. But now you're calling him independent. Doesn't that remove some of that taint? Fair enough. He's not independent. He was tasked by the city council to do the work. His title is independent monitor. He's independent from the police department. He's a civilian. But cities like Denver employ monitors to do this work so that they can learn from unprecedented events like the Denver protests. And by weaponizing that fact, the fact that he was tasked with a months-long after-the-fact investigation to make recommendations to the city to change their practices, disincentivizes cities from hiring and employing roles just like those. And then having them admitted against them as fact testimony, not even subject to the protections of Rule 702.  Go ahead. Did he testify as to his opinions and whether any remedial measures had been taken by the city? So the court did preclude him from testifying about the specific recommendations that were at the end of his report. But our position, and what's very clear from the record, is it was impossible to separate the post hoc remedial nature of his investigation from his testimony. In fact, he told the jury, and I'd like to find the quote because I think this is important, that one of the things that he wanted the jury to take away is that he believed DPD should learn from their mistakes and change their practices. And that was in his redirect testimony. Did you object? Well, it was objected to based on Rule 407, and he was allowed to take the stand. There was no specific objection to that particular. Did he make a contemporary objection when those words came out of his mouth? When those words came out, Your Honor, no, there was no contemporary objection. But there was the objection to him taking the stand. Were you the trial attorney? I was not, Your Honor. Counsel, can I have you pivot quickly to instructional error? Yes, Your Honor. So the theory of liability here under Monell with the failure to train, the deliberate indifference was obviously part of that instruction. So again, why does this merit reversal if there was error? Sure. There are two issues with that instruction and with the instructions as a whole. That instruction did say that deliberate indifference was an element of failure to train. It did not say this is element four of that instruction, that it was an element of failure to supervise. So that instruction in and of itself had an error in the elements of the instruction. But didn't you agree to that instruction? We submitted an instruction with those words in it subject to our objection at the pretrial conference. So plaintiffs have asserted that we've invited that error. Because it was your submission. It was. We did submit that instruction on the understanding that we'd have the opportunity to object at the accident. Why did you submit to it in the first place? Why was it your submission in the first place if you didn't agree to it? Well, we offered an instruction that dealt with failure to supervise. Their instruction didn't even mention failure to supervise. So there were problems with that instruction. But at the hearing, at the pretrial hearing to discuss the instructions, we made very clear what our position was. But even putting that aside, even if you agree with them on invited error, the separate problem with that instruction is that the plaintiffs were, the verdict was based on finding liability on all theories of municipal liability. But doesn't it just take one? Well, the concern is, from our perspective, the jury was making its damages determinations based on which theories of liability Denver proved. Plaintiffs have admitted that in their briefing. One of the plaintiffs in particular received a lower damages award simply because the jury found that a First Amendment violation and not a Fourth Amendment violation had been proved. So there is a likelihood that by misinstructing the jury on theories of Monell liability, the damages would have been different had the instructions been correct. Okay. Thank you, counsel. You're out of time. Thank you, Your Honor. Good morning, Your Honors. May it please the court and welcome to our new colleagues. The three-week jury trial that underlies this appeal proceeded exactly as it should. The jury was correctly instructed. The trial judge permissibly exercised discretion in making evidentiary rulings, and the jury returned a unanimous verdict, finding for the plaintiffs on all their theories of Monell liability. Do you disagree that deliberate indifference was needed to be instructed as to all of the theories? We do, Your Honor. Deliberate indifference was required only for the inaction theories, the failure to train. That's precisely what this Court has held in Schneider. All of this Court's cases sort of go back to Schneider. That's from 2013. To quote this Court on page 770, the challenge practice may be deemed an official policy or custom for 1983 liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a policymaker, or a deliberately indifferent training or supervision. Right? Specifically carving out. And I can talk about first principles of Monell and how the Supreme Court got there in the city of Canton, but deliberate indifference is about inaction theories, failure to supervise, failure to train, failure to screen for hiring purposes, because that's how you know that the city made a choice, and it's being held responsible for its choice. Because when you're deliberately indifferent to not doing something, you have to be on actual or constructive notice that it's likely to lead to a constitutional violation, or it's so obvious that a constitutional violation will result that you should be taking some action. So that's the dividing line. That's how the jury was instructed. And that's precisely what they found. And I want to say that we can prevail on any one of the Monell theories. The verdict can be sustained to Judge Federico's point, which is why Denver is arguing error in all of them. They have to. They have to run the table. And the arguments that they've made on appeal in today are either waived, they're incorrect, or they're inconsequential to the outcome. Sometimes all three. So your argument is just four square. Yes, the only deliberate indifference was failure to train. Any of the failure theories, right? There's one instruction on failure to train, and deliberate indifference was included as a required element of that instruction that the jury found. And there was no other claim of yours that had deliberate indifference in it, that the jury had to find deliberate indifference? That's correct, Your Honor. And that follows this Court's precedence as well as the Supreme Court's precedence. The introduction of deliberate indifference came a few years into the Monell line of cases. And it came in a failure to train. And your argument is that deliberate indifference only applies to failure to do something rather than affirmatively doing something. Correct, Your Honor. But there was other failures that were argued against Denver, not only failure to train but failure to supervise, for example. So the instruction that Denver proposed included both failure to train and failure to supervise. Our instruction, competing instruction number 16, did not include an instruction on failure to supervise. That was not our theory. And the instruction that Denver submitted, and this is why this is invited error, included deliberate indifference, and everyone understood that the entire instruction included deliberate indifference. For the first three elements, Denver wrote the words failure to train or supervise. For whatever reason, they didn't include the words or supervise in the fourth instruction. That wasn't our call. We advocated for our instruction, which wouldn't have had that error. And so this issue is actually subject to the 28J letter by the parties. This is the tier link decision. And let me just read one quote for you, because this precisely describes what's happening today. Parties cannot craft jury instructions, propose them to the court, then change course on appeal and argue plain error in their own instructions. That's exactly what we have here today. But if we step back and look at that instruction as a whole, the jury understood that deliberate indifference was required. I want to take a moment. So you're arguing a belt and suspenders on, are we talking supervision or training here? So the entire instruction 16, which was called failure to train, right, we didn't actually propose supervision. And the verdict form was called failure to train, and that's what they checked in their box. The jury understood they had to find deliberate indifference to check that box. And they did. And I want to offer the court the past of this. So are you saying that failure to supervise was not ever submitted to the jury as a claim? It was included as a word three times in their instruction. And the box that they had to check was that we satisfied the elements of instruction 16, which included deliberate indifference, and the jury found that we did. And was 16, did it also include failure to train? Yes. It was failure to train or supervise, which is what the formulation that Denver proposed. And that submission had deliberate indifference in it. Yes, Your Honor. Yes, Your Honor. So the path of least resistance to affirmance through all of Denver's arguments runs through failure to train. Let me tell you why. Denver does not contest on appeal the sufficiency of evidence to find constitutional violations for every single plaintiff. Denver does not contest that they had a failure to train policy on crowd control measures. They do not contest the sufficiency of the evidence that that failure caused the injuries in this case. The only thing that they dispute is whether there was sufficient evidence to find deliberate indifference. And there was. We had unrebutted expert testimony that covered both of the prongs of deliberate indifference. Chief Stamper said that large-scale protests were utterly predictable in a metro area like Denver. Dr. McGuire, who is a professor of criminal justice, said there was an obvious potential for violation of the rights of protesters. Expert testimony is enough under this Court's decisions in Valdez and Allen. But Denver's own officers acknowledged the lack of training and, you know, what the consequences would be. There were statements made inside the command post. How were the officers supposed to know what to do without being trained? There was evidence of Denver officers testifying that training was taken off the table by the chief of police. Did Denver put in any affirmative evidence in of what their training was? Any training materials or anything like that? Ms. Warren can probably talk to more detail about what the training was. This was focused on what the training wasn't. Okay, well, just watch that time then. I am, I am. I can feel the eyes behind me, Your Honor. I'll be very interested in that information. Yeah, and so that's an important point. Let me stop you for just a minute. Since we're running short of your time, I'm going to ask you to tell us about the independent observer and whether you think the independent observer's testimony was harmless. So it was harmless, but let me also say why Judge Jackson's rulings were correct. Let's start with 602, personal knowledge. Judge Jackson limited Nick Mitchell to testifying about what he did, his personal observations and his personal conclusions and the notices that he previously gave to Denver about the inadequacies of their policies and training. In the dividing line, I just want to have one quote from 701 to 702, because that took up a lot of time on the other side. And I want to direct this Court's attention. Hold on. Let me ask you a question. Notices about their policies and training, were those pre-incident notices? Yes, Your Honor. This was on rebuttal. They said that he hadn't given notice. It was about the Occupy protests in 2012 and Denver's decision not to take those recommendations and go forward. And so on the line between 701 and 702, which was discussed, the Dermon case from this Court in July, that's 143 F. 4th, 1148, the dividing line is that 701 testimony is based on particularized knowledge based on investigation. 702 testimony is based on specialized knowledge based on training or experience. To the extent there is a gray area there, it is not an abuse of discretion for Judge And he limited Nick Mitchell's testimony in important ways, precluding him from talking about remedial measures and other recommendations. But didn't Mr. Mitchell tell the jury or essentially give his opinion as to the adequacy of crowd control, crowd management, the use and training for less than lethal weaponry? I mean, that sounds a whole lot like expert testimony, doesn't it? So the two opinions that Denver identifies are that Nick Mitchell said that it was based on specialized knowledge. We all can conclude that from the 127 videos that were submitted to the jury. But also that Denver lacked internal controls, which is what he concluded based on his personalized investigation. This is no different than if a company Well, that's sort of a specialized determination on whether someone has an internal control, because I suspect the people from Denver feel like they do have some internal controls. And they came and the individual officers testified and corroborated Nick Mitchell's testimony, which will get to the harmlessness. And I'll allow Ms. Wong to address that. Thank you, Your Honors.  Look at that. You've got your five minutes. Good morning, Your Honor. This is a historic first. We ought to get the Denver Post in here to record this. All right. And I'm going to let you go over 12 seconds. Okay. My name is Elizabeth Wong, and I represent the Votori plaintiffs. Let me quickly address the issues. Nick Mitchell's testimony was entirely harmless. First of all, he testified to facts, as Mr. Anderson explained. But also, Denver elicited the exact same testimony that he gave on the facts and on their lack of internal controls from their own witnesses. Their own less lethal training coordinator, Ryan Grothy, admitted that they didn't have inventory tracking and, in fact, that they had changed the policy after the protest. Their crowd force training, field force training coordinator, Eric Knutson, testified that they reduced the amount of training in the years leading up to the protest and that they had inadequate training. A lot of the same training came to test the- Did he say the word inadequate or simply that the budget was reduced? Those are two different questions. Well, he testified that he offered to have DPD officers trained over a three-day period, and the commander said no, they didn't want to do that. Right. But you told us that he said that the training was inadequate. Okay. Let me be more specific. Nick Mitchell never- You've got to be more. That's a very critical statement you've represented to us. Nick Mitchell never said inadequate. He was never asked to opine on the facts that he testified to. He simply testified to the facts. He testified about their inventory tracking or lack of inventory tracking. He testified about the training, the reduction in training in the years leading up to the protest. And so this testimony came not only from our two experts, Chief Stamper and Professor McGuire, but it came from Denver's own witnesses. And in fact, the capstone of Denver's defense at the end of the three-week trial was Division Chief Thomas getting up there and admitting that mistakes were made. That's what they had him testify to. Counsel, how do you respond to Denver's argument, though, that Independent Monitor Mitchell was called because essentially Denver hired him as an expert and that way the plaintiffs were able to highlight to the jury in closing that, Sure. We brought forth two experts who oftentimes are attacked on cross-examination as being hired guns by a party. But Mitchell's different. He's categorically different because Denver recognized his expertise when they hired him. So how do you respond to that argument? The response is that they're picking out a single sentence from an hour-and-a-half long closing argument that the plaintiffs gave over a three-week trial at which 32 witnesses testified and 127 videos were shown. Well, that's powerful, though, isn't it, for you to be able to say that Mitchell's their guy? Mitchell was their guy. I know. But he was also the Independent Monitor. But just because evidence is bad for them doesn't mean that it violated 403. And the fact is the standard of review here is abuse of discretion. And that means did the district court judge make a permissible choice within the range of choices? And he absolutely did. And let me quickly turn in my remaining time to the failure-to-train claim. I'm going to stick with me for a minute. I'm going to make sure you get to say something about failure-to-train.  Do you have any cases where somebody like him has testified before and have been found to just be sort of inconsequential, cumulative testimony? I don't have any cases like that. There is a case from about 20 years ago, a district court case, where there was the testimony of the Independent Monitor at that time. I think his name is Richard Rosenthal, was considered at summary judgment. I don't know whether that case went to trial or was settled after that. But it was considered at summary judgment.  Thank you. All right. On the failure-to-train. This is why we win. All right? Because the plaintiffs, my clients, won on both their First and Fourth Amendment claims. So whatever you think of the First Amendment claim, they won on their Fourth Amendment claim, which the other side does not dispute. They won on the failure-to-train. The jury checked a box saying that they won on the failure-to-train. The jury instruction that they proposed was given before the final pretrial conference. The language that they point to where they made an objection about deliberate indifference was in objection to Instruction 15, which is the official policy instruction. Nobody ever argued, not them, not us, not the district court, below, that somehow deliberate indifference did not apply to failure to supervise. It absolutely did. And it was in the instruction. If you look at Volume 11, page 161, that is the instruction that was given. It was in the paragraph that defines deliberate indifference. And so any objection to their instruction that they gave now is completely invited error and cannot be considered. And so that leaves us with the only other question, which is whether or not there was sufficient evidence of deliberate indifference. And there absolutely was, not just from our experts. McGuire, actually on the stand at the end of his direct testimony, said, did the failure-to-train present an obvious potential for violation of First and Fourth Amendment rights? He said, yes. Denver didn't even cross him on that. And they did not argue deliberate indifference in their closing. Thank you. Thank you, counsel. All right. The case will be submitted, and counsel are excused.